AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)        ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT

4/2/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ GDO _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

04/02/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ cld _____ DEPUTY

| | |
|---|---|
| United States of America | |
| v. | |
| Andrei-Cristian Anton, aka "Mathias Viren," | Case No.    2:24-mj-01898-DUTY |
| Defendant. | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about April 1, 2024, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(2) | Use of unauthorized access devices |

This criminal complaint is based on these facts:

   *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Eric T. Brown*
*Complainant's signature*

_____
Eric T. Brown, HSI SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone. Date:  April 2, 2024

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Maria A. Audero, U.S. Magistrate Judge

_____
*Printed name and title*

AUSA: Joseph De Leon (x7280)

## **AFFIDAVIT**

I, ERIC T. BROWN, being duly sworn, declare and state as
follows:

## I.  **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal
complaint against Andrei-Cristian Anton AKA Mathias Viren
("ANTON") for a violation of 18 U.S.C. § 1029(a)(2) (use of
unauthorized access devices).

2.    This affidavit is also made in support of an
application for a warrant to search a black cellular phone
seized from ANTON (the "SUBJECT DEVICE") and currently in the
custody of Homeland Security Investigations ("HSI"), in Long
Beach, CA, as described in Attachment A.

3.    The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of 18
U.S.C. §§ 371 (Conspiracy), 1029 (Fraud and Related Activity in
Connection with Access Devices), 1344 (Bank Fraud), and 1028A
(Aggravated Identity Theft) (collectively, the "Subject
Offenses"), as described more fully in Attachment B.
Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
search warrants, and does not purport to set forth all of my
knowledge of or investigation into this matter.  Unless

specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent ("SA") with HSI and have been so
employed since February 2019.  I am currently assigned to the
Los Angeles Cybercrimes and Incident Response Team ("CIRT")
where I primarily investigate cybercrimes and cyber-enabled
crimes, including network intrusion, business e-mail compromise,
cryptocurrency scams, wire fraud, identity theft, credit card
fraud, bank fraud, and money laundering.  I have received both
formal and informal training from HSI and other institutions
regarding cyber- and financial-related investigations, the
customs clearance process, cryptocurrency tracing, and computer
forensics.  I have a master's degree in business administration
and have been a Certified Fraud Examiner since 2013.

## III. SUMMARY OF PROBABLE CAUSE

6.    Between August 2022 and November 2023, the California
Department of Social Services ("DSS") has detected more than
$100 million in stolen funds from victim Electronic Benefit
Transfer ("EBT") cards.  Much of this fraud is from two specific
programs known as CalFresh and CalWORKS, which help low-income
households pay for housing, food, and other necessary expenses.
Many of the fraudulent withdrawals are done at specific ATMs in
the Central District of California.

7.    On or about April 1, 2024, at approximately 5:30 a.m.,
law enforcement conducted physical surveillance at a Wells Fargo

Bank located at 8548 Van Nuys Blvd, Panorama City, California ("Target Bank"), which was identified by DSS as one of the top ATM locations for EBT fraud.

8.    At approximately 5:59 a.m., law enforcement saw ANTON arrive at an ATM terminal located in the Target Bank where law enforcement was conducting surveillance.  ANTON withdrew approximately $11,920 in cash from the ATM in rapid succession using approximately 16 different access devices.  Law enforcement detained ANTON and found approximately 25 access devices (later determined to be cloned cards, 16 of which had the same EBT card information ANTON used to withdraw $11,920 in cash from the ATM).  ANTON was arrested and found to be in possession of approximately $11,500 in cash and the SUBJECT DEVICE.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

9.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.    Regulatory Background of CalFresh and CalWORKs Programs

10.   DSS is a government agency that administers several benefit and assistance programs for residents of the state of California.  One of the assistance programs administered by DSS is called CalFresh (formerly known as food stamps), which helps low-income households purchase food and household items to meet their nutritional needs.  Another assistance program administered by DSS is called CalWORKs, which helps low-income

families with children pay for housing, food, and other necessary expenses.

11.   Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply online for benefits at www.getcalfresh.org and www.benefitscal.com.  Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

12.   CalFresh and CalWORKs benefits are issued through Electronic Benefit Transfer cards ("EBT cards").  EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions. For example, you can use an EBT card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

13.   The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN").  A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs.

14.   Benefits received through the program are typically disbursed to EBT cardholders by DSS during the early days of each month.  Those benefits are deposited directly from DSS into the account of the EBT cardholder.

15.   The EBT cardholders can then conduct cash withdrawals at automated teller machines ("ATMs") using a personal

identification number ("PIN") established by the card holder. The EBT cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by DSS intended for beneficiaries of the CalFresh or CalWORKs programs.

      **B.    Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

     16.  Since in or about August 2022, local law enforcement has been working with DSS to investigate a significant increase in unauthorized cash withdrawals utilizing EBT cards.  Based on analysis of victim complaints to DSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

     17.  A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe.  Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the DSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

     18.  On a legitimate debit or credit card, the information coded on the card's magnetic stripe will match the information embossed on the front of the card.  This information includes the account number, expiration date, and cardholder's name,

among other information.  Whereas on a cloned card, the
information coded on the magnetic stripe will not match the
information embossed on the front of the card.  For example, if
a suspect re-encodes victim EBT card information onto a pre-
existing gift card's magnetic stripe or a blank white plastic
card with a magnetic stripe, the magnetic stripe will be coded
with the EBT card information, but the card itself will still
bear the information of the gift card or bear no information if
it is a blank white plastic card.

19.  Based on my training, experience, and participation in
this investigation, I know that the victim card data harvested
to clone cards is often obtained from what is colloquially
referred to as "skimming activity."

20.  The term "skimming" is used to describe activity that
involves unlawfully obtaining debit and credit card information
by using technological devices to surreptitiously record victim
accountholder's debit and credit card numbers and personal
identification numbers at, for example, ATMs or point-of-sale
terminals.  For example, individuals conducting ATM "skimming"
may install a skimming device into the card reader of the ATM to
record the debit or credit card numbers, as well as a camera or
keypad overlay on the ATM keypad to record the associated PIN
number.  Those individuals will then return to the ATM to
collect the card number and PIN information stored on the
installed device.

21.  As described above, suspects then manufacture cloned
and fraudulent debit or credit cards that bear the victim

accountholder's account information that was obtained from
skimming.  Once that information is loaded onto another
fraudulent card (e.g., a gift card or blank plastic card),
members of the scheme then use that fraudulent card to withdraw
cash from the victim accountholder's bank accounts or to make
purchases with the victim accountholder's account.

22.  In or about September 2022, local law enforcement
conducted a surveillance and arrest operation in the Los
Angeles, California area.  This operation was planned in
response to the large number of unauthorized withdrawals
occurring at ATMs in the Los Angeles area during a short period
of time.  Specifically, law enforcement had analyzed fraudulent
EBT withdrawal data and noticed a high volume of unauthorized
withdrawals on specific dates and times that coincided with the
dates when the majority of benefits are disbursed to EBT
cardholders.

23.  As a result of this operation, local law enforcement
established surveillance at select ATMs that were used to
conduct a significant volume of EBT fraud.  Law enforcement
surveilled those ATMs around the dates when benefits had been
disbursed, observed suspects that withdrew a high volume of
unauthorized withdrawals and that conducted those withdrawals in
rapid succession, and arrested multiple individuals believed to
be making fraudulent withdrawals of EBT benefits.  As a result,
law enforcement arrested approximately 16 suspects.  All of the
arrested suspects were later determined to be citizens of
countries other than the United States who did not have

documentation to be lawfully present in the United States.  All of the individuals arrested were released from local custody within hours of their arrest and absconded from any future judicial proceedings.

24.  In or about February 2023, in response to a further increase in unauthorized cash withdrawals utilizing EBT cards after the local law enforcement September 2022 operation, federal law enforcement conducted a similar surveillance and arrest operation in the Los Angeles, California area.  Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs.  Law enforcement arrested three suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession.  Two of those defendants came to the ATM together, possessed 35 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that they had made more than $190,000 in past attempted fraudulent EBT withdrawals from a single bank since October 2022.  One additional defendant possessed 269 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that the defendant had made more than $70,000 in past attempted fraudulent EBT withdrawals from a single bank since January 2023.  All three of these defendants were determined to be citizens Romania, who did not have documentation to be lawfully present in the United States.  The three arrested defendants were ordered detained pending trial by the Hon. Karen Stevenson and Hon. Margo A. Rocconi.  A federal

grand jury returned two indictments against the three defendants for bank fraud, in violation of 18 U.S.C. § 1344; aggravated identity theft, in violation of 18 U.S.C. § 1028A; use of unauthorized access devices, in violation 18 U.S.C. § 1029(a)(2); and possession of unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), in 23-CR-0076-FLA and 23-CR-0077-JFW.

25.  In or about March 2023, federal law enforcement conducted another surveillance and arrest operation in the Los Angeles, California area. Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs. Law enforcement arrested eleven suspects that conducted a high volume of unauthorized transactions and that conducted those transactions in rapid succession. At the time of their arrest, the suspects had in their possession over 400 cloned cards, $120,000 in illicitly obtained funds, and multiple skimming devices.

26.  Ten out of the eleven of these defendants were determined to be citizens of Romania, who did not have documentation to be lawfully present in the United States.

**C.  Background of Current Operation to Combat EBT Fraud**

27.  Data provided by DSS, based in part upon reported fraud by victims, reported fraud to local law enforcement, bank records, and surveillance indicates that as of in or about November 2023, there has been over $100 million in stolen funds from victim EBT cards.

28.   Between in or about June 2023 and in or about November 2023, more than approximately $45.3 million has been stolen from victim EBT cards. Of the approximately $45.3 million stolen, approximately $17.3 million has been stolen from victim EBT cards, in the county of Los Angeles alone.  The majority of these funds were stolen through unauthorized ATM withdrawals.

29.   Between on or about November 1, 2023, and on or about November 5, 2023, more than approximately $9.5 million was stolen from victim EBT cards largely through unauthorized ATM withdrawals.  Of the approximately $9.5 million stolen from victim EBT cards in the beginning of January 2023, more than approximately $2.7 million was stolen, almost entirely through unauthorized ATM withdrawals, in Los Angeles County alone.

30.   Based upon my training and experience conducting access device fraud investigations, I know that suspects committing access device fraud schemes will often target particular BINs when harvesting stolen card information collected from skimming devices.  Thus, suspects using skimming may target the BIN associated with DSS, in essence, targeting CalFresh and CalWORKs benefits.  Moreover, based upon my training and experience, the sheer volume of unauthorized ATM withdrawals occurring during the early days of the month is further indicative that suspects participating in the fraud scheme at issue are targeting EBT cards because benefits are typically disbursed to EBT cardholders during the early days of each month.

31.   Law enforcement has also reviewed ATM surveillance
provided by financial institutions that administer EBT accounts
that relate to the fraud scheme at issue.  During the
unauthorized ATM withdrawals, suspects can often be seen holding
stacks of cards and conducting withdrawals in quick succession
at one ATM.  Based upon my training and experience, I know that
suspects perpetrating access device fraud schemes will often
conduct unauthorized withdrawals using cloned cards in rapid
succession at ATMs.

32.   Based upon the rapid succession of unauthorized ATM
withdrawals being conducted, the fact that the cards being used
to conduct the unauthorized cash withdrawals are nearly all
cloned EBT cards, and the fact that nearly all of the
unauthorized withdrawals are happening during the early days of
the month, I believe that suspects participating in the fraud
scheme at issue are ostensibly targeting EBT cards.

**D.   ANTON Committed EBT Fraud Using Unauthorized Access
        Devices on April 1, 2024**

33.   Based on DSS data, I learned that between March 1,
2024 and March 4, 2024, the Target Bank was used to conduct the
most unauthorized ATM withdrawals in the entire State of
California, victimizing 153 cardholders with a $95,860 financial
loss.  Based upon the large dollar amount being stolen from
victim EBT cards, the number of victims impacted, the
concentration of unauthorized ATM withdrawals occurring in
particular areas, and the large number of unauthorized ATM
withdrawals occurring at singular bank locations, law

enforcement conducted a surveillance and arrest operation in April 2024.

34.  Based upon my training and experience, I know DSS disburses CalFresh and CalWORKs benefits into EBT accounts at approximately 6:00 a.m. during the first three days of the month.

35.  On or about April 1, 2024, beginning at approximately 5:30 a.m., law enforcement began surveillance on the Target Bank.

36.  At approximately 5:59 a.m., based on my review of surveillance footage, ANTON and co-conspirator 1 entered the Target Bank and walked up to separate individual ATM terminals. Law enforcement saw ANTON and co-conspirator 1 conduct multiple transactions, which appeared to be withdrawals based upon law enforcement observing ANTON retrieve what appeared to be currency at the conclusion of each transaction.  Law enforcement saw ANTON for approximately ten minutes conducting what appeared to be several withdrawal transactions in rapid succession. Law enforcement observed ANTON appear to insert several different cards to conduct withdrawals, and put the retrieved currency into his pockets on several occasions.  Based upon my training and experience, individuals conducting legitimate transactions at ATMs typically conduct a single transaction and do not transition between multiple payment cards rapidly to conduct several transactions in a short period of time.

37.  Based on the date, time, ATM location, presence of multiple, and successive ATM withdrawals on multiple EBT

cardholder accounts during a short time period, law enforcement detained ANTON in order to investigate further.

38.   ANTON had approximately 25 cloned cards in his jacket and pants pockets.  22 of the cloned cards consisted of Wells Fargo Visa debit cards all with the same card number 4000123456789010, cardholder name "Henry Wells", expiration date of 12/2020 (currently expired), and no card verification value ("CVV").  Additionally, the Wells Fargo cloned cards were of poor print quality, often with faded and/or striped ink, and contained no embossing.  The remaining three cloned cards were Greendot Visa pre-paid debit cards.  The cards also had stickers placed on them with, what appeared to be, based on my training and experience, card balances and victim PINs.  The following photo is an example of a seized Wells Fargo cloned card:

 

39.   I analyzed the magnetic stripe of the cloned cards and determined all of them were encoded with mismatching card numbers.  20 of the cards were encoded with EBT BINs.  The remaining five cards were encoded with unknown BINs at this time.  Moreover, the cloned cards also were affixed with stickers bearing victim PIN numbers and balances that closely

corresponded to each cloned card and withdrawal amount and were needed in order to conduct the unauthorized ATM withdrawals.

40.  Based on my review of ATM surveillance stills and logs from Wells Fargo, I saw ANTON perform 18 transactions involving EBT card numbers -- all of which matched EBT card numbers encoded on the cloned card seized from ANTON incident to his arrest.  16 of those transactions were successful withdrawals totaling $11,920 in financial loss.  The remaining 2 were attempted but not authorized transactions totaling $1,100 in attempted financial loss.  ANTON had approximately $11,500 in cash in his pockets, which was close in value to the approximately $11,920 in total unauthorized ATM withdrawals. Wells Fargo ATM surveillance photographs obtained by law enforcement also clearly depicted ANTON at the ATM conducting the unauthorized withdrawals using cloned EBT cards and directly corroborated law enforcement's surveillance observations.

41.  Based on my review of EBT cardholder information obtained from DSS, none of the EBT cards transacted by ANTON belonged to him.

42.  During processing, ANTON admitted to being a citizen and national of Romania.  ANTON further admitted to being in the U.S. illegally.  ANTON also provided a State of Washington driver's license under the name "Mathias Viren" and continued to use this alias while being booked.

43.  I queried ANTON in U.S. Department of State databases and learned he was never granted a visa to enter the U.S.  Based

on my training and experience, I know that Romanian citizens are required to have a visa to enter the U.S.

44.   I queried ANTON in U.S. Customs and Border Protection databases and learned he never entered the U.S. through a legal port of entry.

45.   I queried ANTON in U.S. Immigration and Customs Enforcement databases and learned he was deported on June 9, 2008 after being deemed inadmissible for being an immigrant without an immigrant visa.

46.   Based on my training and experience, I believe ANTON illegally entered the U.S. and has no legal immigration status to be present in the U.S.  Additionally, I believe he knows about legal ports of entry and avoids using them for entry into the U.S. due to a lack of a visa and/or immigration status.

47.   The SUBJECT DEVICE was retrieved from ANTON's pockets and placed into a faraday bag to secure the device pending issuance of a search warrant.

48.   After being advised of his Miranda rights, ANTON declined to speak with law enforcement and asked for an attorney.

### V. <u>TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES</u>

49.   Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a.   It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital

devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

      b.   Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items retrieved from stolen mail or mail matter, with their cellphones.

      c.   It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Identity thieves often keep such information in their cars, storage units, and in their digital devices.

      d.   It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units.  Software relevant to such schemes can also often be found on digital devices, such as computers.

      e.   Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos. Suspects may also have paper copies of such records, which they may keep on their person or in their cars, homes, or storage units.

      f.   Individuals engaged in mail and identity theft often use multiple digital devices, which they may keep on their person or in their cars or homes.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[1]

50.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[1] As used herein, the term "digital device" includes the SUBJECT DEVICE as well as any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

  c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

  d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

 51. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

52.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//
//
//
//
//
//
//

## VII. <u>CONCLUSION</u>

53.   For all of the reasons described above, there is probable cause to believe that ANTON has committed a violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd day of
April, 2024.

_____
THE HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE

21